18-2121-ag (L)
*Natural Resources Defense Council, Inc. and State of Vermont v. United States Environmental Protection Agency*

# UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term, 2019

Argued: November 20, 2019     Decided: June 5, 2020

Docket Nos. 18-2121-ag; 18-2670-ag

NATURAL RESOURCES DEFENSE COUNCIL, INC., STATE OF VERMONT,

*Petitioners,*

— v. —

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ANDREW R. WHEELER, IN HIS CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

B e f o r e:

WALKER, LYNCH, and SULLIVAN, *Circuit Judges.*

Petitioners Natural Resources Defense Council, Inc., and the State of Vermont seek review of certain provisions of a rule promulgated by the United States Environmental Protection Agency, pursuant to the Toxic Substances Control Act, 15 U.S.C. § 2607(b)(10), that requires manufacturers to report

information about their use of mercury. In particular, petitioners argue that three exemptions for categories of manufacturers and importers are unlawful. We agree with respect to the exemption from all reporting requirements for those who import products containing a mercury-added component, but reject petitioners' challenges to the other exemptions. Accordingly, we GRANT REVIEW of and VACATE 40 C.F.R. § 713.7(b)(2) but DENY REVIEW of 40 C.F.R. §§ 713.7(b)(3) (exempting manufacturers of products containing mercury-added components from all reporting requirements) and 713.9(a) (exempting manufacturers or importers of large quantities of mercury from certain reporting requirements).

––––––––––––

GABRIEL DALY, Natural Resources Defense Council, New York, NY (Katherine Desormeau, Natural Resources Defense Council, San Francisco, CA; Sarah C. Tallman, Natural Resources Defense Council, Chicago, IL, *on the brief*), *for Petitioner Natural Resources Defense Council, Inc.*

Justin E. Kolber, Assistant Attorney General, *for* Thomas J. Donovan, Jr., Attorney General for the State of Vermont, Montpelier, VT, *for Petitioner State of Vermont.*

ANDREW S. COGHLAN, Trial Attorney, Environmental Defense Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C. (Jeffrey Bossert Clark, Assistant Attorney General, Jonathan D. Brightbill, Deputy Assistant Attorney General, Erin Koch, U.S. Environmental Protection Agency, Washington, D.C. *on the brief*), *for Respondents.*

Ellen F. Rosenblum, Attorney General of Oregon, Benjamin Gutman, Solicitor General, Oregon, Steven Novick, Special Assistant Attorney General, Oregon, William Tong, Attorney General of Connecticut, Clare E. Connors, Attorney General of Hawaii, Aaron Frey,

Attorney General of Maine, Brian E. Frosh, Attorney General of Maryland, Maura Healey, Attorney General of Massachusetts, Gurbir S. Grewal, Attorney General of New Jersey, Josh Shapiro, Attorney General of Pennsylvania, Peter F. Neronha, Attorney General of Rhode Island, Robert W. Ferguson, Attorney General of Washington, Max Kieley, Assistant Attorney General, Minnesota, *for Amici Curiae* Oregon, Connecticut, Hawaii, Massachusetts, Maine, Maryland, Minnesota (by and through its Minnesota Pollution Control Agency), New Jersey, Pennsylvania, Rhode Island, and Washington.

———————

GERARD E. LYNCH, *Circuit Judge*:

In 2016, Congress amended the Toxic Substances Control Act of 1976 ("TSCA") to require the U.S. Environmental Protection Agency ("EPA") to "carry out and publish" a triennial "inventory of mercury supply, use, and trade in the United States." 15 U.S.C. § 2607(b)(10)(B). In 2018, EPA promulgated the Mercury Reporting Rule ("Reporting Rule"). As relevant here, the Reporting Rule requires "[a]ny person who manufactures (including imports)" mercury or a "mercury-added product" to report information on their products, *see* 40 C.F.R. §§ 713.7(a), (b), 713.9; it also exempts certain categories of manufacturers and importers from various reporting obligations. Three of those exemptions are at issue in this case.

3

Under § 713.7(b)(2) and (b)(3), importers and manufacturers, respectively, of products that contain a mercury-added product as a component are exempt from all reporting requirements. Under § 713.9(a), persons who manufacture or import elemental mercury or mercury compounds in significantly large amounts are exempt from certain reporting requirements.

Petitioners Natural Resources Defense Council, Inc., ("NRDC") and the State of Vermont ("Vermont") (together, "petitioners") challenge those three exemptions from the Reporting Rule as unlawful agency action. As explained below, we find that the exemption for importers of products containing mercury-added components is an unlawful interpretation of the TSCA, because it lacks a reasoned explanation. We find that the exemption for manufacturers of products with mercury-added components and the exemption for high-volume manufacturers are lawful in light of Congress's directive to "not require reporting which is unnecessary or duplicative." 15 U.S.C. § 2607(a)(5)(A). We therefore GRANT REVIEW of and VACATE the exemption codified at 40 C.F.R. § 713.7(b)(2) and DENY REVIEW of the exemptions codified at 40 C.F.R. §§ 713.7(b)(3) and 713.9(a).

# BACKGROUND

## I.    Uses and Dangers of Mercury

Mercury is a naturally occurring element. It is also a potent neurotoxin that does not degrade over time, making it both a significant public health threat and a danger to the environment. One way that mercury enters the environment is through the manufacture, use, and disposal of products that contain mercury. Mercury released through those processes converts biologically into methylmercury, the element's most toxic form, which bioaccumulates in wildlife. Methylmercury exposure in wildlife can cause death, reduced fertility, slowed development and growth, and abnormal behavior that affects survival. Human exposure occurs primarily from the ingestion of mercury through the consumption of fish and shellfish. Elevated methylmercury levels in the bloodstreams of young children and fetuses have been found to adversely affect cognitive development. Studies also suggest that mercury exposure may affect humans' reproductive, renal, cardiovascular, and hematologic health.

Mercury has long been used in a wide range of industrial processes and as an ingredient in many familiar products. Historically, mercury has been used in products including batteries within watches, toys, and cameras; paint; pesticides;

cosmetics and skin care products; pharmaceuticals; vaccines; dental amalgam; fluorescent, neon, and ultraviolet lamps used in car headlights, street lights, neon signs, commercial lighting, and tanning beds; thermometers, blood pressure cuffs, and other medical devices; and switches and relays used in pumps, appliances, and industrial machinery. Since 1980, largely due to increased awareness of the environmental and health dangers of mercury, the use of mercury-added products in the United States has decreased by over 97 percent. Nevertheless, mercury-added products including batteries, lamps, dental amalgam, and switches and relays continue to be sold extensively in the United States.

Since at least 2006, EPA has made the reduction of mercury-related risks an agency priority. The United States is a party to the Minamata Convention, an international agreement that seeks to protect human health and the environment from the effects of mercury contamination. State governments have also been instrumental to the reduction of mercury use nationwide, by enacting legislation that restricts the production and sale of mercury-added products, regulates their disposal, and implements labeling requirements. Thirteen states, including Vermont, have formed a coalition of state environmental agencies, the Interstate

Mercury Education and Reduction Clearinghouse ("IMERC"), which manages an interstate reporting system for manufacturers and a related database of information on mercury use.

## II. Statutory Background

The TSCA authorizes EPA to regulate the use of "chemical substances and mixtures . . . whose manufacture, processing, distribution in commerce, use, or disposal may present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601(a)(2); *see also id*. § 2605(a). The statute directs EPA to promulgate rules requiring manufacturers and processors of chemical substances to maintain records of their use of such substances and report that information to EPA. *See id*. § 2607(a)(1)(A), (B).

In 2016, Congress enacted the Frank R. Lautenberg Chemical Safety for the 21st Century Act, which amended the TSCA by adding (among other things) specific directives with respect to mercury. Section 8(b)(10) of the amended TSCA provides that "[n]ot later than April 1, 2017, and every 3 years thereafter, the Administrator shall carry out and publish in the Federal Register an inventory of mercury supply, use, and trade in the United States." 15 U.S.C. § 2607(b)(10)(B). It directs EPA, in doing so, to "identify any manufacturing processes or products

7

that intentionally add mercury" and to "recommend actions, including proposed revisions of Federal law or regulations, to achieve further reductions in mercury use." *Id*. § 2607(b)(10)(C).

The statute also includes a directive to manufacturers, calling on "any person who manufactures mercury or mercury-added products or otherwise intentionally uses mercury in a manufacturing process" to "make periodic reports to the Administrator, at such time and including such information as the Administrator shall determine by rule" in order "[t]o assist in the preparation of the inventory under subparagraph (B)." *Id*. § 2607(b)(10)(D)(i). The TSCA's definitions provision makes clear that the "manufacture" of a chemical substance includes manufacturing, producing, or "import[ing] [it] into the customs territory of the United States." *Id*. § 2602(9).

The statute directs EPA to "avoid duplication" by "coordinat[ing] the reporting under this subparagraph with [IMERC]." *Id*. § 2607(b)(10)(D)(ii). It further provides that, in carrying out this section of the TSCA, EPA "shall, to the extent feasible[,]" "not require reporting which is unnecessary or duplicative" and "minimize the cost of compliance with this section and the rules issued thereunder on small manufacturers and processors." *Id*. § 2607(a)(5), (A), (B).

8

### III. Regulatory Background

In accordance with the amended TSCA's requirements, EPA published its initial inventory of mercury supply, use, and trade in 2017. Because EPA had not yet promulgated a rule that directed manufacturers to report mercury use for inclusion in the triennial inventory, its 2017 inventory drew exclusively on publicly available data, which EPA acknowledged was "notably limited in applicability to certain aspects of supply, use, and trade" and "in some cases [] outdated." J. App'x 440. For that reason, EPA concluded that it was "premature" to "identify any manufacturing processes or products that intentionally add mercury" or to "recommend actions . . . to achieve further reductions," as required by the TSCA. *Id*. (quoting 15 U.S.C. § 2607(b)(10)(C)).

On June 27, 2018, EPA published the Mercury Reporting Rule ("Reporting Rule") in the Federal Register. *See* Mercury; Reporting Requirements for the TSCA Mercury Inventory, 83 Fed. Reg. 30,054 (June 27, 2018); 40 C.F.R. pt. 713. The Reporting Rule "specifies reporting and recordkeeping procedures . . . for certain manufacturers (including importers) and processers of mercury" in order to facilitate EPA's statutorily mandated publication of a triennial mercury inventory. 40 C.F.R. § 713.1(a). The reporting requirements apply to "[a]ctivities

9

undertaken with the purpose of obtaining an immediate or eventual commercial advantage" involving the "[i]mport" or "[m]anufacture (other than import)" of either mercury or mercury-added products, or the "[i]ntentional use of mercury in a manufacturing process," as well as related activities such as the "[d]istribution in commerce, including domestic sale or transfer," "[s]torage," and "[e]xport" of mercury. *Id*. § 713.1(b). Information must be reported for both "[e]lemental mercury" and "mercury compound[s]." *Id*. § 713.5.

The Reporting Rule requires that "[a]ny person who manufactures (including imports) mercury" or "a mercury-added product," aside from specified categories of exempted persons, "must report." *Id*. § 713.7. Those who are not required to report include, *inter alia*, manufacturers who do not seek a commercial advantage and persons "engaged only in the generation, handling, or management of mercury-containing waste." *Id*. § 713.7(a)(1), (b)(1), (a)(3). Under § 713.7(b), the following categories of persons are also excused from all of the rule's reporting requirements:

> (2) A person engaged only in the import of a product that contains a component that is a mercury-added product; or

> (3) A person engaged only in the manufacture (other than import) of a product that contains a component that is a

10

mercury-added product who did not first manufacture (including import) the component that is a mercury-added product.

Both of these provisions concern products that contain mercury only within a component ("assembled products"). A watch that contains, as one constituent part, or "component," a mercury-added battery, is an assembled product; so, too, is a car with a mercury-added lamp in its headlight. By contrast, a mercury-added component – in the above examples, a battery or lamp that contains mercury – is not itself an assembled product.[1] Under § 713.7(b)(2), an importer of an assembled product, manufactured abroad, is exempt from the requirements of the Reporting Rule. Under § 713.7(b)(3), a domestic manufacturer of an assembled product is also exempt, so long as it does not also manufacture the mercury-added component. Thus, a domestic entity that either manufactures or imports a watch with a mercury-added battery need not report to EPA, so long as that entity does not also import or manufacture the mercury-added battery itself.

Manufacturers and importers who *are* subject to the Reporting Rule's

---

[1] For purposes of this analysis, we assume that batteries contained within watches and lamps contained within car headlights are not themselves "assembled products" made up of multiple constituent parts.

requirements generally must report the quantities of mercury, in pounds, that

they have manufactured, imported, exported, stored, and distributed in

commerce over relevant time periods. *Id*. § 713.9(b). But here, too, the Reporting

Rule makes exceptions for certain manufacturers and importers: "Persons who

manufacture (including import) mercury in amounts greater than or equal to

2,500 pounds (lbs.) for elemental mercury or greater than or equal to 25,000 lbs.

for mercury compounds for a specific reporting year must report" only the

quantities stored and distributed in commerce, and not the quantities

manufactured, imported, or exported. *Id*. § 713.9(a). Although it may seem

counterintuitive to exempt persons who manufacture or import the *most* mercury

from regulations designed to survey the extent of mercury usage, EPA already

requires that these same manufacturers and importers report under another EPA

regulation that predates the Mercury Reporting Rule.[2]

---

[2] That regulation, the Chemical Data Reporting Rule ("CDR Rule"), promulgated in 2011, requires persons who export or manufacture mercury "in an amount of 25,000 lb . . . or more (or in an amount of 2,500 lb . . . or more for [elemental mercury]) . . . at any one site during any calendar year" to report the amounts of mercury they have manufactured and exported. 40 C.F.R. § 711.15(b), (b)(3)(iii), (iv). The CDR Rule specifies that the category of "manufacturers" "includ[es] importers." *See id*. § 711.15(b).

**DISCUSSION**

NRDC and Vermont timely petitioned this Court for review of the Mercury Reporting Rule. *See* 15 U.S.C. § 2618(a). Specifically, petitioners seek review of three provisions that excuse categories of manufacturers and importers from the rule's reporting requirements: (1) the exemption for manufacturers of assembled products with mercury-added components, 40 C.F.R. § 713.7(b)(3); (2) the exemption for importers of assembled products with mercury-added components, 40 C.F.R. § 713.7(b)(2); and (3) the partial exemption (in the form of curtailed reporting requirements) for high-volume manufacturers and importers, 40 C.F.R. § 713.9(a).

As explained below, we conclude that the exemptions for assembled product manufacturers and high-volume manufacturers are reasonable in light of Congress's directive to EPA to avoid requiring duplicative or unnecessary reporting. We therefore deny review of §§ 713.7(b)(3) and 713.9(a). However, we find that EPA has failed to provide a reasoned explanation for the exemption for assembled product importers. For that reason, we grant review of § 713.7(b)(2) and vacate that provision.

## I.    Standing

Before addressing the merits of petitioners' arguments, we must first consider the threshold question of their standing to challenge the lawfulness of the Mercury Reporting Rule. EPA does not challenge petitioners' standing to bring this appeal. Nevertheless, "[t]he question of standing is not subject to waiver: 'We are required to address the issue . . . even if the parties fail to raise the issue before us.'" *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009) (internal alterations omitted) (quoting *United States v. Hays*, 515 U.S. 737, 742 (1995)). The "irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact. . . . Second, . . . the injury has to be fairly traceable to the challenged action of the defendant. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and alterations omitted).

Petitioners NRDC and Vermont both assert that they have Article III standing on the basis of expected informational deficits. They contend that the challenged exemptions from the Reporting Rule will create gaps in EPA's published mercury inventories, and that they will be injured by their lack of

access to the information that would otherwise fill those gaps. "The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt [petitioners'] claim that the information would help [petitioners]." *Campaign Legal Ctr. & Democracy 21 v. Fed. Election Comm'n*, 952 F.3d 352, 356 (D.C. Cir. 2020) (internal quotation marks omitted); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21-22 (1998); *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989). Here, because "there is no reason to doubt" that (1) "access to additional information about [mercury] manufactured or [imported] in the United States will promote" NRDC's advocacy efforts and Vermont's law enforcement efforts, and (2) "a decision by this [C]ourt to vacate or require reconsideration of the rule would remedy th[e] asserted harm by requiring the disclosure of additional information," petitioners have established standing under Article III. *See Envtl. Def. Fund v. EPA*, 922 F.3d 446, 452-53 (D.C. Cir. 2019).

Both NRDC and Vermont allege a particularized interest in the information captured by EPA's mercury inventory, including the information that would be collected from assembled product importers, assembled product manufacturers, and high-volume manufacturers absent the challenged provisions. NRDC alleges

15

that it relies on information about mercury use to support its practice of advocating for mercury reductions, and that the exemptions pose an obstacle to effective advocacy. Vermont alleges that the exemptions will affect its ability to enforce state laws that restrict the sale and use, mandate notification and labeling, and regulate the disposal of mercury-added products.

Petitioners also allege that the challenged provisions unlawfully exempt from reporting obligations groups of manufacturers and importers from whom EPA is required to collect information under the amended TSCA. If that claim is correct, the challenged provisions of the Reporting Rule will improperly omit information that, under the statute, ought to be publicly disclosed in reports to the agency and in the agency's published inventory and that will help NRDC in its advocacy efforts and Vermont in its law enforcement efforts. We are satisfied that NRDC and Vermont have alleged an injury in fact. Petitioners' asserted injuries are further fairly traceable to the alleged omissions of information, in the sense that they would not suffer from the asserted informational deficit absent the challenged reductions in reporting and disclosure. The vacatur of the challenged provisions would redress those injuries by requiring that exempted groups of manufacturers and importers report under the Reporting Rule, so that

16

information pertaining to their use of mercury would be reflected in EPA's published inventories. Petitioners have therefore established standing under Article III.

## II. Legal Standard

"We evaluate challenges to an agency's interpretation of a statute that it administers within the two-step *Chevron* deference framework." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 507 (2d Cir. 2017) (citing *Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 264 (2d Cir. 2016)); *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). At *Chevron* Step One, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If Congress's directive is unambiguous, both the agency and the courts are bound by that mandate. *Id*. at 842-43. If, instead, "the statute if silent or ambiguous with respect to the specific issue," the analysis proceeds to *Chevron* Step Two. *Id*. at 843; *see also Catskill Mountains*, 846 F.3d at 507. At that step, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

In evaluating reasonableness at *Chevron* Step Two, "we will accord

17

deference to the agency's interpretation of the statute so long as it is supported by a reasoned explanation, and 'so long as the construction is a reasonable policy choice for the agency to make.'" *Catskill Mountains*, 846 F.3d at 507 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005)). Because "a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps," the agency's interpretation must only be reasonable, and need not be the sole permissible or even most reasonable interpretation of the statute. *Id*. at 520 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)); *see also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009).

When a petitioner challenges the procedure by which an agency engaged in rulemaking, rather than the substance of the rule, we assess whether the agency's "action, findings, and conclusions" are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," pursuant to the Administrative Procedure Act. 5 U.S.C. § 706(2), (2)(A). Challenges to agency procedure are evaluated under the standard set out in *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Under that standard, we defer to an agency's

18

determinations so long as the agency "give[s] adequate reasons for its decisions," in the form of a "'satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *State Farm*, 463 U.S. at 43).

"*State Farm* and *Chevron* provide for related but distinct standards for reviewing rules promulgated by administrative agencies." *Catskill Mountains*, 846 F.3d at 521. "Much confusion" stems from the fact that "both standards purport to provide a method by which to evaluate whether an agency action is 'arbitrary' or 'capricious,' and . . . often, though not always, take the same factors into consideration**.**" *Id*. at 522. The Supreme Court and this Court have clarified that the reasonableness of "[a]n agency's initial interpretation of a statutory provision should be evaluated only under the *Chevron* framework," which looks to whether the interpretation is substantively reasonable. *Id*. at 521; *see also Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 502 n.20 (2002). By contrast, "*State Farm* is used to evaluate whether a rule is procedurally defective as a result of flaws in the agency's decisionmaking process" and applies, *inter alia*, "when an agency changes its interpretation of a particular statutory provision." *Catskill Mountains*, 846 F.3d at 521, 523.

The Mercury Reporting Rule is EPA's initial interpretation of § 8(b)(10) of the TSCA, as amended by Congress in 2016. *See* 15 U.S.C. § 2607(b)(10); *see also* Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, § 8(b), 130 Stat. 448, 475 (2016). Petitioners assert that the exemptions for importers and manufacturers of assembled products contained in 40 C.F.R. § 713.7(b)(2) and (b)(3) contravene the TSCA and thus exceed EPA's rulemaking authority. These are substantive challenges to EPA's initial act of statutory interpretation through rulemaking. Accordingly, we review the reasonableness of § 713.7(b)(2) and (b)(3) under *Chevron*. Petitioners challenge the partial exemption for high-volume manufacturers contained in 40 C.F.R. § 713.9(a) both as an unreasonable interpretation of the TSCA and as the product of flawed rulemaking procedures. Accordingly, we evaluate their substantive challenge to § 713.9(a) under *Chevron* and their procedural challenge to that provision under *State Farm*.

### III. Exemptions for Importers and Manufacturers of Assembled Products

Petitioners contend that the reporting exemptions for importers and manufacturers of assembled products, codified at 40 C.F.R. § 713.7(b)(2) and

20

(b)(3), are unlawful because they contravene Congress's clear statutory directive that manufacturers of mercury or mercury-added products report to EPA. *See* 15 U.S.C. § 2607(b)(10)(D)(i). EPA argues that these exemptions are within the scope of its broad authority, as delegated by Congress, to determine what reporting is necessary to complete the statutorily required inventory, and that they are consistent with the TSCA's letter and purpose.

## A. *Chevron* **Step One**

Petitioners first assert that the TSCA unambiguously requires that EPA mandate reporting from importers and domestic manufacturers of assembled products that contain mercury only within a component, thereby rendering the reporting exemptions for such persons irreconcilable with the statute's plain meaning. They rely principally on the TSCA's language providing that "[t]o assist in the preparation of the inventory . . . , any person who manufactures mercury or mercury-added products . . . shall make periodic reports to the Administrator." 15 U.S.C. § 2607(b)(10)(D)(i). We conclude that this language does not unambiguously foreclose the exemptions at 40 C.F.R. § 713.7(b)(2) and (b)(3).

Petitioners argue that the TSCA unambiguously requires *all* manufacturers

21

of mercury or mercury-added products to report, and that importers and manufacturers of assembled products with mercury-added components are indisputably "person[s] who manufacture[] . . . mercury-added products." 15 U.S.C. § 2607(b)(10)(D)(i). The TSCA expressly defines "[t]he term 'manufacture'" to include importation, *see id*. § 2602(9), and EPA concedes that the term "mercury-added product" unambiguously includes assembled products in which mercury exists solely in a component, such as a watch with a mercury-added battery or a car with mercury-added lamps in its headlights. Thus, there is no question that importers and domestic manufacturers of such assembled products are encompassed within the category of "any person who manufactures mercury or mercury-added products." 15 U.S.C. § 2607(b)(10)(D)(i).

We conclude, however, that the TSCA does not unambiguously direct EPA to require reporting from *every* manufacturer of a mercury-added product. Petitioners contend that "any person," as used in the TSCA, clearly means "all persons," and that the verb "shall" underscores the mandatory nature of such persons' obligation to report — and thus, necessarily, the mandatory nature of EPA's obligation to require that such persons report. They therefore contend that the plain meaning of the TSCA is that EPA must require reporting from *all*

22

*persons* "who manufacture[] mercury or mercury-added products." *Id*.

But Congress also directs EPA, in the very same section of the TSCA (and using the same mandatory "shall") "not [to] require reporting which is unnecessary or duplicative," *id*. § 2607(a)(5)(A), "to the extent feasible," *id*. § 2607(a)(5). That provision not only authorizes, but also *requires*, EPA to exempt certain manufacturers from otherwise applicable reporting requirements, where requiring the reporting would be "unnecessary or duplicative." In short, the TSCA requires all persons who manufacture mercury or mercury-added products to "make periodic reports to the Administrator," but such persons are required to report only "such information as the Administrator shall determine by rule." 15 U.S.C. § 2607(b)(10)(D)(i). And the Administrator may determine what needs to be reported, if anything, provided that the determination comports with the statutory goal of facilitating the inventory while avoiding reports that are unnecessary for that purpose or duplicative.

Because the TSCA does not unambiguously mandate that EPA require reporting from every manufacturer of a mercury-added product, EPA's exemptions in 40 C.F.R. § 713.7(b)(2) and (b)(3) for certain manufacturers of mercury-added products — specifically, those who import into or manufacture

23

within the United States assembled products with mercury added only to a component — do not directly contravene the TSCA's plain meaning.

At the same time, however, the statutory language does not unambiguously authorize or require those specific exemptions. It presumptively mandates reporting by all manufacturers and importers, to the extent necessary to accomplish the purposes of the statute, with the exception that EPA should not require unnecessary or duplicative reporting. Because the statute does not directly address the specific question of reporting by manufacturers or importers of products with mercury-added components, whether the exemptions from reporting such products are appropriately granted in light of the directive to avoid the unnecessary or duplicative is not answerable based on the language of the statute. Rather, the appropriateness of these exemptions must be addressed at *Chevron* Step Two, based on the reasonableness of the agency's rationale for granting them.

## B. *Chevron* **Step Two**

Because the TSCA is "silent or ambiguous" on the question of whether EPA's exemption of manufacturers and importers of assembled products containing mercury-added components from its reporting requirements is

appropriate in light of its obligation to avoid requiring "unnecessary or duplicative" reports, we must determine whether the exemptions are "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In doing so, "we ask whether the agency's action is arbitrary, capricious, or manifestly contrary to the statute." *Cooling Water Intake Structure Coal. v. EPA.*, 905 F.3d 49, 65 (2d Cir. 2018) (internal quotation marks omitted). "[W]e will accord deference to the agency's interpretation of the statute so long as it is supported by a reasoned explanation . . . ." *Catskill Mountains*, 846 F.3d at 507. "Even under this deferential standard, however, agencies must operate within the bounds of reasonable interpretation." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (internal quotation marks omitted). "[A]n agency interpretation that is inconsistent with the design and structure of the statute as a whole does not merit deference." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (internal citation, quotation marks, and alteration omitted).

**1. Exemption for Manufacturers of Assembled Products**

40 C.F.R. § 713.7(b)(3) exempts from reporting requirements "[a] person engaged only in the manufacture (other than import) of a product that contains a component that is a mercury-added product who did not first manufacture

(including import) the component that is a mercury-added product." Under this provision, a domestic manufacturer of assembled products is exempt from reporting requirements if the only mercury in its product is within a component that was imported or manufactured by another entity. A manufacturer who produces or imports the component itself is not exempt. In other words, an assembled product manufacturer is exempt from reporting on the mercury present in a component of its product only if some other manufacturer or importer previously introduced that mercury-added component into the U.S. market. Significantly, in that situation, the person or entity that manufactured or imported the *component* would be required to report that activity.

Congress directed EPA both to collect reports from "any person who manufactures . . . mercury-added products" and "not [to] require reporting which is unnecessary or duplicative." 15 U.S.C. § 2607(b)(10)(D)(i), (a)(5)(A). Where two different manufacturers engage with the same mercury-added component — because, for example, one produces the component and the other adds it to an assembled product — it is reasonable for EPA to deem it "unnecessary or duplicative" to require both manufacturers to report. No provision of the Reporting Rule exempts either importers or domestic

26

manufacturers of mercury-added components. Because the Reporting Rule requires that any person who introduces a mercury-added component to the U.S. market (either by importing or by producing it) is required to report on that component, EPA will have information about the nature and extent of the use of mercury in such component products. For example, once a manufacturer or importer of batteries reports on the presence of mercury in its product, that mercury is accounted for within EPA's triennial inventory, and EPA may reasonably decline to require additional reporting from the domestic watchmaker who uses those batteries as a component in its watches.

Petitioners argue that EPA exaggerates the administrative burden that "double counting" imposes on the agency and that it elides meaningful distinctions in the data that would be gathered from component-makers (or component importers) and assembled product manufacturers who use those components. But even if those arguments are meritorious, they speak only to whether EPA's interpretation is optimal from a policy perspective, and not to whether this exemption is "within the bounds of reasonable [statutory] interpretation." *Michigan*, 135 S. Ct. at 2707 (internal quotation marks omitted). Whether or not the exemption for certain assembled product manufacturers was

the *most* reasonable way of interpreting EPA's obligation to require reporting insofar as it is not duplicative, it is certainly *a* reasonable interpretation. *See Entergy Corp.*, 556 U.S. at 218.[3]

We therefore deny review of 40 C.F.R. § 713.7(b)(3).

**2. Exemption for Importers of Assembled Products**

40 C.F.R. § 713.7(b)(2) exempts from reporting requirements "[a] person engaged only in the import of a product that contains a component that is a mercury-added product." Under this provision, an importer of assembled products is exempt from reporting requirements if mercury is present only within a "component" of the imported product. Thus, for example, the exemption covers an importer of foreign-made watches that contain mercury within their batteries (and nowhere else), but not a person who imports those same batteries as a stand-alone product.

Unlike § 713.7(b)(3), discussed above, the reporting that would occur absent this exemption would not be duplicative. In the case of an assembled

---

[3] Thus, we do not suggest that EPA was *required* to adopt the exemption in 40 C.F.R. § 713.7(b)(3). If EPA had determined that the additional information that would be captured by requiring reporting now exempted would further the statutory goal and would not be duplicative, we would be presented with a different question not at issue in this case, and on which we express no view.

product made by a domestic manufacturer, the mercury-added component will have been reported by the manufacturer or importer of the component. But with respect to an assembled product manufactured abroad that contains mercury-added components that are themselves produced outside the United States (as opposed to components manufactured domestically, then exported and integrated into assembled products abroad before being imported), no other entity is required to report the mercury in the component, and no portion of the Mercury Reporting Rule accounts for the mercury present in the components of the assembled products manufactured abroad.[4] The importers exempted by § 713.7(b)(2) are the very persons who introduce that mercury into the U.S. market. Thus, EPA cannot (and does not try to) rationalize this exemption on the theory that it eliminates redundant reporting. Nor does it argue, on the basis of

---

[4] EPA suggests that it will draw on information from the IMERC database to ensure that its inventory accounts for mercury use that will not be reported pursuant to the exemption for assembled product importers. But EPA does not explain how information collected by IMERC, a coalition of only thirteen states, sufficiently accounts for the presence of mercury in components of imported assembled products nationwide. Indeed, in 2017, EPA itself acknowledged that it could not rely on IMERC and other public data to "develop a complete inventory," J. App'x at 441, in part because "if a company sells products only in states other than IMERC Notification states, then the company does not report to IMERC." J. App'x at 443.

any data in the administrative record, that such reporting would be

"unnecessary" because the quantity of mercury introduced into the American

marketplace by such imports is *de minimis* – indeed, it is difficult to see how it

would be possible to know that without the very reporting that the exemption

eschews.

Instead, EPA advances two other rationales for the reasonableness of this

exemption. It relies principally on the theory that Congress had no interest in

reporting from importers of assembled products with mercury-added

components, because such importers are too attenuated from the intentional

addition of mercury into the products.[5] In the alternative, it argues that the

exemption is reasonable because it relieves importers of the undue burden of

complying with reporting obligations. For the reasons discussed below, we find

neither of these rationales persuasive and conclude that the importer exemption

is not a reasonable interpretation of the TSCA. We therefore grant review of 40

C.F.R. § 713.7(b)(2).

---

[5] EPA also asserts this rationale in support of § 713.7(b)(3), discussed above. Because we find that provision reasonable in light of EPA's obligation not to require duplicative reporting, we discuss this rationale only in relation to § 713.7(b)(2).

### a. Intentionality Rationale

EPA argues that the exemption for importers of assembled products with mercury-added components is reasonable because it is consistent with the TSCA's focus on manufacturers who use mercury intentionally. The TSCA calls on EPA to "identify any manufacturing processes or products that *intentionally* add mercury" and requires periodic reporting from "any person who manufactures mercury or mercury-added products or otherwise *intentionally* uses mercury in a manufacturing process." 15 U.S.C. § 2607(b)(10)(C)(i), (D)(i) (emphases added). EPA infers from that language that Congress intended for it to require reporting only from manufacturers whose use of mercury in their products or processes was deliberate. Because the persons exempted under 40 C.F.R. § 713.7(b)(2) import assembled products of which merely a component contains mercury, EPA views such persons as categorically "unintentional" with respect to the presence of mercury in their products.

We are not persuaded. As a practical matter, the Reporting Rule necessarily can generate reports only from individuals or entities who know that their products contain mercury. An importer cannot report information about mercury in its product if it is unaware of that mercury's existence. So long as the

31

importer knows that its product contains mercury, however, it acts intentionally with respect to the presence of that mercury in its product, and the introduction of that mercury into the United States market. As a categorical matter, an importer of cars with mercury-added lamps in their headlights is no less "intentional" about the presence of mercury in its product than an importer of the lamps themselves: assuming that both importers are aware of the mercury's presence, the fact that one imports the component on its own and the other imports it within an assembled product is irrelevant to question of their comparative intentionality. And Congress clearly did not intend to exempt importers altogether, given that it specifically defined the term "manufacture" to include "import." *See* 15 U.S.C. § 2602(9).

Moreover, if EPA were correct that importers described in § 713.7(b)(2) are categorically unintentional and therefore fall outside the universe of persons from whom Congress intended EPA to collect reports, it would follow that EPA lacks statutory authority to require such importers to report. As EPA's counsel clarified at oral argument, however, that is not EPA's position. Rather, EPA maintains that it could, if it chose to, require importers of assembled products with mercury-added components to report. Its contention that Congress intended

for it to exclude such importers is therefore untenable.

To the contrary, Congress's instruction to EPA to create and publish "an inventory of mercury supply, use, and trade, in the United States," 15 U.S.C. § 2607(b)(10)(B), evinces its affirmative interest in cataloguing both the nature and extent of mercury use in the United States economy. Congress made clear that it intends EPA to collect and publish information on mercury use in products that are imported, as well as those that are manufactured domestically. *See id*. § 2602(9). To carry out its obligations under the TSCA, EPA must publish in its inventory information regarding the types and quantities of imported products that contain mercury; it must therefore require reports from all importers of such products, absent an alternative source of information that renders such reporting unnecessary or duplicative. EPA cannot accurately estimate the volume of mercury introduced into the United States market within imported products if it declines to catalogue a potentially significant swath of those products.

Furthermore, if EPA does not collect data from all importers of assembled products, its inventory may omit entire categories of imported products that contain mercury-added components, if similar products either are not manufactured in the United States or are manufactured here without the use of

33

mercury. The record before us contains no information regarding the existence or non-existence of any such categories of product. But that is exactly the point: without a reporting requirement, one can only speculate about how significant or insignificant the potential omissions may be. There is no reasonable basis for EPA to conclude either that Congress did not care about imported assembled products with mercury-added components, or that the quantity of such products or the amount of mercury they contain is *de minimis*.

**b. Compliance Burden Rationale**

EPA also asserts that the exemption at § 713.7(b)(2) is based on a desire to avoid imposing an undue burden on covered importers. EPA seems to invoke three distinct kinds of costs related to compliance with the Reporting Rule: (1) the cost of actual compliance, *i.e.*, the costs to importers of filing reports; (2) the cost of compliance determination, *i.e.*, the burden of inquiring into the presence of mercury in one's products to determine if the reporting requirements apply; and (3) the cost of inadvertent noncompliance, *i.e.*, penalties for failing to file required reports.

None of these burdens is unique to importers of assembled products with mercury-added components. EPA's estimates of compliance costs distinguish

only between the initial reporting cycle and subsequent reporting cycles; the record contains no estimate that draws a distinction between the costs imposed on different kinds of regulated persons to support its assertion of divergent burdens. Beyond the bare assertion that compliance burdens weigh more heavily in this context, EPA fails to establish that any of these burdens apply with special force or are otherwise "undue" as applied to the importers subject to the exemption.

At oral argument, EPA alternatively framed its concern for the cost of actual compliance as an effort to protect small "mom and pop" importers whose limited financial means might make compliance with the Reporting Rule particularly burdensome. Oral Argument at 33:38-36:00. Had EPA categorically exempted small businesses on this theory, we might well find such an exemption reasonable. Indeed, the TSCA instructs EPA that it "shall, to the extent feasible . . . minimize the cost of compliance with this section and the rules issued thereunder on small manufacturers and processors." 15 U.S.C. § 2607(a)(5), (B). But EPA expressly determined during its rulemaking process that "small businesses are not exempt from reporting requirements." Mercury; Reporting Requirements for the TSCA Mercury Inventory, 83 Fed. Reg. at 30,069. It

35

determined instead that it would fulfill its obligation to minimize compliance burdens on small entities by developing tailored reporting instructions and offering technical assistance and other specialized guidance. Furthermore, nothing in the record suggests that assembled product importers subject to the exemption in § 713.7(b)(2) are more likely to be small entities than any other class of regulated manufacturers or importers. Accordingly, we can discern no basis in the administrative record from which to conclude that the choice to excuse importers, large and small, of products with mercury-added components from all reporting requirements is rationally related to a desire to avoid imposing undue burdens on small businesses.

EPA also suggests that *any* compliance cost imposed on an importer of assembled products is undue, because it interprets the TSCA "to only require the identification of the *types* of products where mercury is intentionally added." 83 Fed. Reg. at 30,065 (emphasis in original). EPA reasons that the reports collected from manufacturers and importers of mercury-added components will provide it with sufficient information on the types of assembled products (and components included therein) that contain mercury. In other words, EPA knows that some imported watches contain mercury in their batteries because it requires reporting

from importers of the batteries themselves; therefore, on this theory, it is not necessary for importers of watches that contain mercury-added batteries also to report.

Even if we assume (without accepting) that EPA may reasonably interpret the TSCA to permit inventories that enumerate only "types" of mercury use, and not quantities of mercury used,[6] it does not follow that reporting from assembled product importers would be unnecessary to such inventories. It is entirely possible that foreign manufacturers might use mercury-added components in "types" of assembled products that domestic manufacturers do not, and export those assembled products to the United States. And if U.S. manufacturers do not independently use the mercury-added components contained within those imported assembled products, those foreign-made mercury-added components

---

[6] While we do not find it necessary to assess the reasonableness of this interpretation of the meaning of "inventory," we note that it appears to be inconsistent with other aspects of EPA's interpretation of the TSCA, such as the Reporting Rule's requirement that manufacturers report the "[a]mount of mercury" used. *See* 40 C.F.R. § 713.9. If the task assigned to EPA were as limited as its argument here suggests, the reporting requirements imposed on other covered importers and manufacturers would be greatly reduced. As with the desire to limit the burdens on small businesses, the purported authorization to catalogue only the types of products that contain mercury has not been applied by EPA across the board, but is brought out only in support of this particular exemption.

might not be imported separately, for use in products assembled in the United States. An accurate inventory of "types" of mercury use would therefore need to include information on imported assembled products with mercury-added components. Without that information, the inventory might well omit "types" of assembled products that contain mercury only in their imported forms and "types" of mercury-added components that are not produced domestically and are imported only when integrated into assembled products.[7] We therefore reject the premise that reporting by assembled product importers exempted under § 713.7(b)(2) is unnecessary to EPA's fulfillment of Congress's mandate and thus unduly burdensome.

EPA similarly fails to support its assertion that assembled product importers would be unduly burdened by the cost of determining whether they

_____

[7] Of course, the existence and number of any such products is speculative. Once again, however, EPA cites no information that would support a conclusion that such products do not exist, or that the amount of mercury that might be introduced into the United States through such products is too small to justify a reporting requirement. Its argument is entirely abstract, premised on the proposition that Congress only wanted an inventory of types of products, coupled with the conclusory assertion that reporting on imported products with mercury-added components would not further such a limited inquiry. It is thus EPA's rationale that must be classified as speculative, and based purely on assumptions not supported by the record.

must report, because they are unlikely (at least as compared to other manufacturers and importers) to know whether the products they import contain mercury. EPA notes that its overall estimate of compliance costs includes the cost of compliance determination, but it does not specifically identify how much of its overall estimate is attributable to that aspect of compliance. Without record evidence that supports EPA's theory, we cannot see how the task of determining whether one's product contains mercury imposes anything more than a minor burden. Some regulated persons may already know that their product contains mercury, either because they added it to the product or because they were told; other regulated persons may need to inquire of the manufacturer or supplier from whom they acquire products, components, or materials whether those items contain mercury. The latter group admittedly bears a "burden" that the former group does not, but it is merely the burden of asking a question. And there is no particular reason to assume that importers of products with multiple components (say, automobiles) will find it any more difficult to ask their foreign supplier whether those products include mercury-added components than importers of products that will ultimately be used as components of larger or more complicated products here in the United States (for example, lamps used in

automobile headlights), who are not exempted from that burden.[8]

Finally, EPA suggests that the cost of inadvertent noncompliance may unduly burden importers of assembled products with mercury-added components, because the TSCA provides for both civil and criminal penalties for persons who fail to comply with reporting obligations.[9] But the TSCA imposes criminal penalties for noncompliance only on persons who "knowingly or willfully violate[]" the statute, and it instructs EPA to take into account "the nature, circumstances, extent, and gravity of the violation" and the violator's "ability to pay" and "degree of culpability," among other factors, in administering civil penalties. *See* 15 U.S.C. § 2615(b)(1), (a)(1), (a)(2)(B). Thus, inadvertent violators are exempt from criminal penalties and exposed to civil penalties only inasmuch as EPA determines them to be culpable. The specter of undue penalties for inadvertent violators therefore amounts to a spurious

---

[8] We also see no reason to assume that importers exempted under § 713.7(b)(2) are particularly unlikely to know that their products contain mercury. Many such importers may be affiliates of the foreign manufacturers who produced the mercury-added component; others may be sufficiently aware of the specifications of the products they import to know the chemicals that those products contain.

[9] This rationale again assumes, without support, that importers who are exempted under § 713.7(b)(2) are particularly unlikely to know that their products contain mercury.

concern that EPA will itself misapply the statutory standard and impose unreasonable penalties on this particular category of importers.

We cannot discern any reasoned basis for EPA to exempt importers of assembled products with mercury-added components from the Reporting Rule's requirements. The reporting that would occur absent § 713.7(b)(2) would not be contrary to congressional intent; nor would it be duplicative, unnecessary, or unduly burdensome. We conclude that the importer exemption codified at § 713.7(b)(2) is not "supported by a reasoned explanation" and therefore does not demand deference. *See Catskill Mountains*, 846 F.3d at 507. We therefore grant review of this provision and set it aside.

## IV.   High-Volume Manufacturer Exemption

Petitioners also contend that the partial exemption at 40 C.F.R. § 713.9(a) for "[p]ersons who manufacture (including import) mercury in amounts greater than or equal to 2,500 pounds (lbs.) for elemental mercury or greater than or equal to 25,000 lbs. for mercury compounds" is unlawful. Section 713.9(a) provides that persons who manufacture mercury in amounts at or above the specified quantities must report only the amounts of mercury "stored" and "distributed in commerce," whereas all other manufacturers must also report the

amounts manufactured, imported, and exported. *Compare id*. § 713.9(a), *with id*. § 713.9(b). EPA contends that it designed § 713.9(a) to avoid duplicating the reports that it already requires and collects from high-volume manufacturers under the CDR Rule. *See* 40 C.F.R. pt. 711.

Petitioners argue that this partial exemption in § 713.9(a) is both the product of a flawed decision-making process and contrary to the TSCA. For the reasons explained below, we disagree and deny review of § 713.9(a).

**A. Adequacy of Rulemaking Procedure**

"[W]here a litigant brings both a *State Farm* challenge and a *Chevron* challenge to a rule, and the *State Farm* challenge is successful, there is no need for the reviewing court to engage in *Chevron* analysis. . . . In other words, if an interpretive rule was promulgated in a procedurally defective manner, it will be set aside regardless of whether its interpretation of the statute is reasonable. If the rule is not defective under *State Farm*, though, that conclusion does not avoid the need for a *Chevron* analysis . . . ." *Catskill Mountains*, 846 F.3d at 522. We therefore begin by assessing petitioners' challenge to EPA's rulemaking procedures.

Petitioners contend that EPA based § 713.9(a) on an irrational cost-benefit analysis: it allegedly chose to forgo important informational benefits in order to

save high-volume manufacturers from the minimal costs of complying with some (but not all) reporting requirements. But EPA disclaims reliance on cost-benefit analysis, arguing that the partial exemption is based entirely on its finding that requiring full reporting under both the Reporting Rule and CDR Rule would be duplicative.

The record supports EPA's assertion that it relied on a finding that the two rules would yield comparable information, absent some exemption. The CDR Rule requires that "any person who . . . manufactured (including imported) for commercial purposes" at least 25,000 pounds of mercury compound or 2,500 pounds of elemental mercury must report the "total annual volume [of mercury] . . . domestically manufactured or imported at each site," as well as "the volume used on site and the volume directly exported." 40 C.F.R. § 711.15, (b)(3)(iii), (b)(3)(iv); *see id*. § 711.8(a)(2), (b). The Reporting Rule provides that "[p]ersons who manufacture (including import) mercury in amounts" of at least 25,000 pounds of mercury compound or 2,500 pounds of elemental mercury must report the quantities "stored" and "distributed in commerce," but not the total amounts "manufactured," "imported," or "exported." *Id*. § 713.9(a), (b).

Petitioners argue that requiring high-volume manufacturers to report

(without exemption) under both rules would not be duplicative, because the two rules operate on different schedules for data collection.[10] Because of the different reporting timelines, three out of every four mercury inventories that EPA publishes will include less recent data from high-volume manufacturers than from other reporting entities. But discrepancies in the timing of reporting do not undermine EPA's conclusion that the content of the two sets of reports would be sufficiently comparable to render the reports duplicative.

The Reporting Rule's exemption applies to exactly the same manufacturers who are subject to the CDR Rule's reporting requirement, and it exempts them from reporting information that closely tracks that which the CDR Rule requires them to report. Thus, EPA's reliance on Congress's mandate to avoid requiring duplicative reporting, where feasible, *see* 15 U.S.C. § 2607(a)(5), is "a satisfactory

---

[10] The TSCA requires that EPA publish its mercury inventory every three years, beginning in 2017. 15 U.S.C. § 2607(b)(10)(B). The Mercury Reporting Rule, designed to facilitate that triennial inventory, sets out a reporting and publication schedule under which the most recent data reflected in the inventory is data from two calendar years prior. (In other words, the inventory published in 2020 will include data through calendar year 2018; the inventory published in 2023 will include data through calendar year 2021.) 40 C.F.R. § 713.17. The CDR Rule requires that manufacturers report every four years, beginning in 2016, on mercury use through the preceding calendar year. (Thus, in 2020 manufacturers will report data from 2016-2019.) *Id*. § 711.20.

explanation for its action" that includes "a rational connection between the facts found and the choice made." *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43). We therefore do not find § 713.9(a) to be arbitrary or capricious as a result of defective rulemaking processes.

**B. Reasonableness of § 713.9(a)**

Petitioners also challenge § 713.9(a) as an unreasonable interpretation of TSCA's directions that "any person who manufactures mercury or mercury-added products . . . shall make periodic reports" and that EPA "shall, to the extent feasible . . . not require reporting which is unnecessary or duplicative." 15 U.S.C. § 2607(b)(10)(D)(i), (a)(5), (A). Because this claim pertains to the reasonableness of EPA's initial interpretation of the amended TSCA, we evaluate the provision under the *Chevron* framework. *See Catskill Mountains*, 846 F.3d at 521.

Our analysis at the first step of the *Chevron* inquiry mirrors that which we applied, above, to the assembled product provisions. Contrary to petitioners' claims, the TSCA's requirement that "any person who manufactures mercury or mercury-added products . . . shall make periodic reports," 15 U.S.C. § 2607(b)(10)(D)(i), does not preclude EPA from determining what information is

required, *id.*, or from creating exemptions for categories of manufacturers or importers of mercury from making reports that it reasonably determines would be unnecessary or duplicative, *id*. § 2607(a)(5)(A). Furthermore, the exemption for high-volume manufacturers is partial rather than categorical: manufacturers subject to the exemption are still obligated to report some information under the Reporting Rule. *See* 40 C.F.R. § 713.9(a). Therefore, even if the TSCA *did* preclude EPA from completely exempting manufacturers who meet its definition, it is far from clear that it would also foreclose § 713.9(a). The provision is not unambiguously contrary to the statute. Nor does the TSCA unambiguously require this specific partial exemption for high-volume manufacturers: the TSCA makes no mention of the CDR Rule, and EPA might have reasonably determined that reports from manufacturers subject to the CDR Rule were necessary to its inventory, notwithstanding those manufacturers' preexisting reporting obligations. Accordingly, we conclude at *Chevron* Step One that § 713.9(a) is neither unambiguously precluded nor required by the statutory text.

At *Chevron* Step Two, we examine whether § 713.9(a) is "based on a permissible construction of the statute." *Kilgour v. SEC*, 942 F.3d 113, 122 (2d Cir. 2019) (internal quotation marks omitted). Petitioners argue that the amounts of

mercury manufactured, imported, and exported can vary considerably from year to year. But notwithstanding this variance, petitioners do not establish that the asynchrony between the reporting obligations under the Reporting Rule and the CDR Rule will so significantly distort the results of the triennial inventory as to make the Reporting Rule's partial exemption for high-volume manufacturers unreasonable.

Considering the substantial overlap between the information that high-volume manufacturers must report under the CDR Rule and the information that the same manufacturers would be required to report under the Reporting Rule, absent § 713.9(a), we find that the partial exemption for such reporters is a reasonable interpretation of EPA's obligation "not [to] require reporting which is . . . duplicative,"15 U.S.C. § 2607(a)(5)(A), "to the extent feasible,"*id*. § 2607(a)(5). Accordingly, we deny review of 40 C.F.R. § 713.9(a).

## CONCLUSION

For the reasons stated above, we DENY REVIEW of the exemption for manufacturers of assembled products with mercury-added components at 40 C.F.R. § 713.7(b)(3) and the partial exemption for high-volume manufacturers at 40 C.F.R. § 713.9(a), and we GRANT REVIEW of and VACATE the exemption for

47

importers of assembled products with mercury-added components at 40 C.F.R.

§ 713.7(b)(2).